United States District Court
Southern District of Texas
**ENTERED**
October 21, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:25-CR-00046-001 |
| | § | |
| ISHAMEL CADET | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Ishmael Cadet's ("Defendant" or "Cadet") Motion to Suppress (Dkt. 70). Cadet is charged with Conspiracy to Commit Wire Fraud (18 USC 1349), Wire Fraud (18 USC 1343), two counts of Mail Fraud (18 USC 1341), Bank Fraud (18 USC 1344), eleven counts of Possession of a Counterfeit Passport (18 USC 1546), thirteen counts of Aggravated Identity Theft (18 USC 1028A), and Felon in Possession of a Firearm (18 USC 922(g)(1)). Cadet seeks to suppress evidence that he alleges was obtained in violation of his Fourth Amendment rights. The United States of America ("Government") responded in opposition to the motion. (Dkt. 74). The Court conducted a suppression hearing on September 16, 2026. After considering the motion, response, evidence, testimony from the hearing, and applicable law, the Court finds that Cadet's motion should be **DENIED**.

## I. FACTUAL BACKGROUND

On January 23, 2025, agents from the U.S. Department of State, Diplomatic Security Service, and local police officers went to 420 Drennan Street, Houston, Texas with an arrest warrant for Ciera Blas ("Blas"). Blas was wanted for passport fraud and aggravated identity

theft out of the Eastern District of Texas. Law enforcement had used cell site data to locate Blas at the residence. Through surveillance, officers had observed a female matching Blas's description and another person enter the unit. Officers had also spoken with the owner of the unit who identified Blas from a photo as an occupant of the unit. The owner told agents that Blas resided there with her infant child and a male. The owner also showed agents a copy of the leasing agreement for the premises and the photo identification document that was used to rent the property. These documents showed the lessor was "Jaylen Adeola."

When police arrived to arrest Blas, Cadet exited the townhome. Blas would not exit and said she was there with a baby. The officers detained Cadet, while other officers had to enter the home to arrest Blas. While approaching Blas and conducting a protective sweep, officers saw smashed cell phones, two firearms, ID digital printers, a laptop, blank white plastic cards and a United States passport card. Additionally, after conducting a biometric scan of Cadet officers learned that he had a criminal history, including two felony convictions. Subsequently, an arrest warrant for Cadet was obtained in addition to a search warrant for the townhome. Cadet filed a motion to suppress the Government's use of all evidence seized as a result of the detention and protective sweep. The Government responded in opposition. (Dkt. 74). Testimony and evidence were provided to this Court during a hearing on the matter. (Dkt. 82).

## II. APPLICABLE LAW

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. Amend. IV. "Because the Fourth Amendment itself contains no enforcement mechanism, the exclusionary rule developed as a judicially-created remedy to safeguard Fourth Amendment rights." *United States v. Edmond*, No. 18-cr-00091-01, 2018 WL 4178228, at *3 (W.D. La. Aug. 6, 2018) (citing *Davis v. United States*, 564 U.S. 229, 236 (2011)). "In general, the exclusionary rule prohibits the introduction of evidence at trial that is derivative of an unconstitutional search or seizure and thereby deters police misconduct." *Id.* (citing *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005)). "Under the fruit of the poisonous tree doctrine, all evidence derived from an illegal search or seizure must be suppressed unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *Id.* (citing *United States v. Jones*, 234 F.3d 234, 243-44 (5th Cir. 2000)).

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). However, "[w]arrantless searches and seizures are presumptively unreasonable, subject to certain exceptions." *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020). Therefore, "when the government searches or seizes a defendant without a warrant,

the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *Guerrero-Barajas*, 240 F.3d at 432.

## III. ANALYSIS

In his Motion, Cadet asserts that all evidence obtained as a result of his detention and the protective sweep should be suppressed because the evidence is the fruit of an unconstitutional search and seizure. Following a hearing on the Motion, the main questions before this Court are (1) whether Cadet's detention violated the Fourth Amendment, (2) whether the protective sweep was justified in its scope, and (3) whether the firearms found in the townhome were seen in plain view.[1] Although initially providing briefing on standing, the parties informed the Court at the hearing that standing was no longer contested.

### A. The detention was legal.

Cadet argues that his detention was unlawfully prolonged after the legitimate law enforcement purpose was accomplished. Specifically, Cadet argues that once officers had removed Blas from the home and once Cadet had provided his information, he should have been free to go. This Court finds that Cadet's initial detention was justified by reasonable suspicion and that his continuing detention was supported by probable cause.

#### *i. Initial Detention and Reasonable Suspicion*

"While the Fourth Amendment generally requires officers to obtain a warrant before searching or seizing an individual, under the 'very narrow exception' announced in *Terry*

[1] Each of the parties raised several sub-arguments that are addressed throughout this opinion, however these are the main issues that the parties identified.

*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), police officers may briefly detain a person for investigative purposes if they can point to ‘specific and articulable facts’ that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime.” *United States v. Monsivais*, 848 F. 3d 353, 357 (5th Cir. 2017) (cleaned up). For reasonable suspicion to detain, “it is clear that the officer’s mere hunch will not suffice. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.” *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

“Pursuant to *Terry*, the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer’s action was justified at its inception, and then inquire whether the officer’s subsequent actions were reasonably related in scope to the circumstances that justified the stop.” *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Cadet did not raise issue with whether the officer’s action was justified at the inception, instead arguing that he should have been free to go after he “had identified himself and was confirmed not to be a party to the arrest warrant or a party associated with the investigation of Ms. Blas.” (Dkt. 70 at p. 12.) It indeed is clear that Cadet’s initial detention satisfies the first prong of *Terry*. Officers testified that they believed they had someone harboring a federal fugitive in the townhome and they also suspected that the lease identity was falsified. Based on this, officers immediately detained Cadet when he exited the townhome as they had reasonable suspicion of crimes related to harboring a fugitive and falsifying identification.

The timeline and facts become a little less clear after this. Defense asserted that "a third officer had already confirmed on camera that Cadet's name had been run through the system and returned nothing" (Dkt. 70 at p. 12) and the body-worn camera does show an officer indicating that he had heard other officers say Cadet was clear and had no history. (Dkt. 81, Ex. 13). However, at the hearing an officer testified that a biometric scan revealed that Cadet had criminal history, including felonies. Additionally, an officer testified that running the biometric scan and receiving this information took approximately fifteen minutes. The officer testified that they were investigating Cadet's identity because they believed Cadet had given a dishonest response when asked about his identity. From the hearing and the body-worn camera, it is unclear why the third officer on camera said Cadet had no criminal history. Despite this inconsistency, this Court finds that the fifteen minutes that Cadet was detained so officers could investigate his identity did not violate the second prong of *Terry*. This is especially true because an investigation into Cadet's identity was clearly "reasonably related in scope to the circumstances which justified the interference in the first place." *Lopez-Moreno*, 420 F.3d at 430 (quotation omitted). Cadet exited a townhome where officers were executing an arrest warrant for a fugitive wanted for charges related to making fraudulent IDs and they suspected that the townhome was being rented under a fake identity, so further investigating Cadet's identity was clearly related to the circumstances that led them to detain him.

While officers were investigating Cadet's identity, other officers inside the townhome were conducting a protective sweep after arresting Blas. During this protective

sweep, officers testified that they discovered firearms in plain view. Defense counsel contests that the firearms could justify ongoing detention, asserting that the firearms could not be connected to Cadet. Indeed, the record does have some discrepancies that require more in-depth analysis. At Cadet's probable cause and detention hearing following his arrest, an officer testified that Cadet said his jacket and shoes could be found "in a downstairs bedroom, which is where the firearms were found, leading [the officer] to believe that those were all his items in that room." (Dkt. 81, Ex. 5 p. 18, lines 9-14). Judge Bryan, based in part on this testimony, found there was probable cause because Cadet "directed them to the room where the two firearms were found." (Dkt. 81, Ex. 5 at p. 29, lines 1-3). At that detention hearing, Defense counsel contested that this is what Cadet said, but conceded "we don't have any evidence of that today." (Dkt. 81, Ex. 5 at p. 29, lines 8-9). However, at the suppression hearing, held before this Court, body-worn camera footage did reveal that Cadet directed officers to an upstairs bedroom for his ID, not the downstairs bedroom where the firearms were found.[2] Despite these discrepancies, the Court believes that the presence of two firearms in the house with Cadet, a felon, was enough for officers to continue to detain him while they investigated the guns that they believed were his.[3] This

[2] Additionally, body-worn camera shown at the evidentiary hearing showed that the officers did not find a wallet or ID in the jacket downstairs. Instead, the footage shows one officer asking "[h]is ID, does he even have one?" and another reaching into jean pockets and jacket pockets in the downstairs bedroom and then responding "[n]o, just cords and wires." (Dkt. 81 Ex. 20). However, an officer testified that it was later that Cadet asked for a jacket because he was cold and that it was in this jacket that they found the wallet with fraudulent IDs and credit cards when he was searched incident to arrest.

[3] Defense made arguments that the government could not establish constructive possession of the firearm and while the inconsistencies between the testimony and the body-worn camera do raise unanswered questions about constructive possession of the firearm, that is not a question to be

is especially true because an officer testified that they believed the guns belonged to Cadet because they were found near men's clothing and shoes. This is confirmed by body-worn camera where one of the officers can be heard saying they thought Cadet had exited from the bedroom downstairs because there were men's shoes in that room.

This Court finds that continuing to detain Cadet to investigate his criminal history and the ownership of the firearms was permissible because "[i]f officers gain new information relevant to safety or criminal conduct, the scope of their permissible investigation may expand." *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010). However, there are still time limits on detention and "a detention may be of excessively long duration even though the officers have not completed and continue to pursue investigation of the matters justifying its initiation." *United States v. Shabazz,* 993 F.2d 431, 437 (5th Cir. 1993).

At the hearing, the government explained that it was a little over four hours from initially detaining Cadet to having the arrest warrant for him signed around 4:00pm, and then it was not until around 9:00pm that he was arrested. When questioned about why the detention was about nine hours total, officers said that they were holding Cadet in

---

decided on a motion to suppress. *See United States v. Huntsberry*, 956 F.3d 270, 279-80 (5th Cir. 2020) (saying "[p]ossession of a firearm may be actual or constructive, and may be proved by circumstantial evidence. . . . We will affirm a finding of constructive possession in cases of joint occupancy "only when there is some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the illegal item.")(cleaned up); *see also United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993) (rejecting the Government's argument "that the fact that [defendant] was living in the bedroom in which the weapon was found is enough to establish constructive possession. . . . Instead, we believe that mere control or dominion over the place in which contraband or an illegal item is found by itself is not enough to establish constructive possession when there is joint occupancy of a place.").

investigative detention. Even though the officers testified they were still investigating, it is likely that this amount of time creates "a more intrusive custodial state which must be based upon probable cause rather than mere reasonable suspicion." *Shabazz*, 993 F.2d at 437. This is especially likely considering the Supreme Court has "decline[d] to adopt any outside time limitation for a permissible *Terry* stop," but has also "never approved a seizure of the person for the prolonged 90-minute period." *United States v. Place*, 462 U.S. 696, 709-10 (1983). The Fifth Circuit has also reasoned that a "detention, which exceeded one hour and thirty minutes, morphed from a *Terry* detention into a de facto arrest." *United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008).

Therefore, even though the government did not contend that this was an arrest supported by probable cause, because of the length of the detention, this Court analyzes Cadet's detention as a de facto arrest. *See Shabazz*, 993 F.2d at 437 (saying "[a] prolonged investigative detention may be tantamount to a de facto arrest, a more intrusive custodial state which must be based upon probable cause rather than mere reasonable suspicion.").

*ii. De facto Arrest and Probable Cause*

"Probable cause exists where 'the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313 (1959) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). "In determining probable cause, 'we deal with probabilities. These are not technical; they are the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Preston*, 608 F.2d 626, 632 (5th Cir. 1979) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "We must also be mindful that probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers. We weigh not individual layers but the laminated total." *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.1978) (*en banc*) (cleaned up).

At this point, officers knew that Cadet was a felon, that he had exited a townhome where a fugitive was residing, and they believed that he had been not entirely honest about his identity and that the townhome was leased under a false name. They also had seen two firearms, ID digital printers, a laptop, white plastic cards, and a United States passport card that they believed to be counterfeit in plain view. These facts, taken together, amount to more than just reasonable suspicion. *See Scroggins*, 599 F.3d at 441 (observing that "reasonable suspicion may "ripen" or "develop" into probable cause for an arrest if a *Terry* stop reveals further evidence of criminal conduct.").

Defense counsel asserted that the officers had no reason to connect any of these items to Cadet and had no reason to believe that he was anything more than an overnight guest at the home, which would deprive them of probable cause to continue to detain him. As previously mentioned, the officers testified that they believed the firearms and some of

the ID supplies were connected to Cadet because they were found in a room with men's clothing. Regardless of if the officers had established a definite connection to Cadet, this Court finds that "the totality of facts and circumstances within [the] police officer's knowledge" amounted to enough for a reasonable person to conclude that a crime had been committed. *Zavala*, 541 F.3d at 575. Further, these were the same facts that were found to support probable cause in the affidavit for his arrest warrant. Therefore, this Court finds that the officers had probable cause to detain him.[4]

Therefore, while Cadet was indeed detained for a lengthy period, this Court finds that his detention was initially justified by officers trying to identify him and his continued detention was justified by the finding of two firearms and learning he was a felon. Indeed, it does not appear that officers gained any additional information between learning that Cadet was a felon and having the arrest warrant signed. At the hearing, the officer testified that once they learned of Cadet's criminal history, they began to type up an affidavit and prepare an application for an arrest warrant. Based on this, it seems that the "delay existed,

---

[4] Beyond arguing that the firearms did not create probable cause for Cadet and were not supported by constructive possession, Defense counsel also took issue with the discussion of the firearms and belongings in the arrest warrant. The arrest warrant stated that the firearms were observed in plain view "adjacent to CADET's personal belongings and men's clothing." (Dkt. 1 at p. 2). Defense counsel contests that this is a false statement and asserts that the Government had no reason to believe those were Cadet's items. This Court finds that even if this were the case, the good faith exception would apply because these statements, even if false, were not made intentionally or recklessly. *See United States v. Locket*, No. CR H-22-072, 2023 WL 5153549, at *3 (S.D. Tex. Aug. 10, 2023), aff'd, No. 23–20584, 2025 WL 2945534 (5th Cir. Oct. 17, 2025) ("The good-faith exception does not apply when the issuing [judge] was misled by information in an affidavit that the affiant knew or reasonably should have known was false. . . . It is Defendant's burden to show by a preponderance of the evidence that the false statements were made intentionally or recklessly.") (internal quotations and citations omitted).

ultimately, because law enforcement officers sought a warrant and warrants take time." *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

**B. The protective sweep was justified.**

Cadet next contests the legality of the protective sweep. When an individual is subjected to a warrantless search, the government has the burden of proving that the search was justified. *United States v. Garcia-Lopez*, 809 F.3d 834, 838 (5th Cir. 2016). A "protective sweep" is an exception to the warrant requirement of the Fourth Amendment. *Maryland v. Buie*, 494 U.S. 325, 326-27, 337 (1990). A protective sweep entails a brief "limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *United States v. Maldonado*, 472 F.3d 388, 393 (5th Cir. 2006). "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327. Protective sweeps may be appropriate even when an arrest occurs outside the home. *Id*. Such a sweep is only justified when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 334.

The Fifth Circuit has articulated four factors that courts generally consider in determining if a protective sweep is legal:

> (1) the government agents have a 'legitimate law enforcement purpose' for being in the house; (2) the sweep is 'supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene;' (3) the sweep is 'no more than a cursory inspection of those spaces where a person may be found;' and (4) the sweep 'last[s] no longer than is necessary to dispel the

> reasonable suspicion of danger' and 'last[s] no longer than the police are justified in remaining on the premises.'

*United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005) (quoting *United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004) (*en banc*)). The Fifth Circuit has also explained that "[i]f reasonable minds could differ on whether the sweep was warranted, we do not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation." *United States v. Silva*, 865 F.3d 238, 242 (5th Cir. 2017) (citing *United States v. Menchaca-Castruita*, 587 F.3d 283, 290 (5th Cir. 2009).

For the first factor, the Court finds that the officers had a legitimate law enforcement purpose for being inside the house. They were there to effectuate an arrest warrant on Blas. (Dkt. 74 at pp. 1-2). Blas did not exit the home when asked by the officers, so they had to enter the home to arrest her.

For the second factor, Cadet argues that the sweep was not justified insofar as it extended after he and Blas were detained. Cadet asserted that after they were detained, officers had no reason to believe there were other dangerous individuals in the home. However, the officers testified that they conducted the additional sweep because of a reasonable suspicion that the house may have harbored additional dangerous individuals, particularly because Blas was a fugitive. The purpose of a protective sweep is ultimately to "protect the safety of police officers or others." *Silva*, 865 F.3d at 241. Because there may be unknown individuals in a home, a "sweep may occur after the suspect has been arrested." *United States v. Roberts*, 612 F.3d 306, 311 (5th Cir. 2010). Additionally, the officers saw what they believed to be evidence of crimes in plain view while they were

arresting Blas. They planned to get a search warrant based on their observations and in the interim, they needed to secure the townhome—both for safety and to ensure no one was in the home who might remove or destroy the evidence. *See United States v. Aug.*, 136 F.4th 595, 604 (5th Cir. 2025) (discussing how officers "swept the home to secure the area while they waited for a search warrant."). Destruction of evidence was a valid concern for the officers, as they testified that there was evidence of smashed phones which they believed Blas had done to destroy evidence. *See United States v. Tsatenawa*, No. SA-21-CR-00073-JKP, 2023 WL 5122454, at *4 (W.D. Tex. Aug. 8, 2023) (finding that a protective sweep was valid and noting that "[t]he sweep was intended to preserve, not collect evidence."); *United States v. Wysocki*, 457 F.2d 1155, 1160 (5th Cir. 1972) (finding a search lawful and saying "[w]e must consider the case on the basis of what the officers saw and the reliable information they possessed.").

For the third factor, Cadet argues that the protective sweep involved "more than a cursory inspection of those spaces where a person may be found." *Mendez*, 431 F.3d at 428. Indeed, evidence offered during the suppression hearing established that the officers searched inside drawers and boxes. However, officers also testified that the reason for this was that there was an infant present in the home that they needed supplies to properly care for. Further, none of the evidence that Defendant seeks to suppress was found in one of these small spaces nor was any of it used in the affidavit to secure the search warrant or arrest warrant. Therefore, "when considering the totality of the circumstances surrounding the officers' actions in regard to the protective sweep, these discrepancies are not enough

to invalidate the officers' protective sweep." *United States v. Beard*, No. 4:22-CR-092, 2023 WL 2172730, at *4 (S.D. Tex. Feb. 22, 2023) (discussing officers looking inside a freezer and toilet tank and finding that although a person could not fit in these spaces, the protective sweep was still valid.).

For the fourth and final factor, the Court finds that the protective sweep lasted no longer than necessary to dispel a reasonable suspicion of danger and no longer than the police were justified in remaining on the premises. The officers testified that they quickly cleared the townhome through a protective sweep. However, Defense counsel argued that they continued to go in and out of the home after the protective sweep was completed.[5] The officers did concede that they continued to enter the home, but again officers testified that this was to care for the infant and they did not begin to search the residence until they had obtained the search warrant. The Court finds this argument to be true and believes that it is further supported by the fact that nothing in the affidavit for the search warrant was not

[5] Defense counsel also argued that "Cadet did not have actual or apparent authority to consent to a search of the home" and that "Cadet did not consent, and his privacy interest in the home cannot support an overbroad search of the home." (Dkt. 70 at pp. 20-21). However, the Government did not argue that Cadet consented to a search of the home, nor did they rely on his consent. The Government asserted that the officers conducted a protective sweep and then obtained a search warrant. Therefore, because the officers did not rely on consent, this argument is not relevant to the analysis of the search of the home. The only search that could have occurred due to his consent was the search for his ID or jacket, which the Court finds was enough consent for the search that occurred. Officers testified that Cadet told them they could find his ID in a jacket and that Cadet asked them to bring him a jacket because he was cold. Cadet "chose not to place any explicit limitations in his response to their general request, which, in this Circuit, is evidence of general consent." *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003). Therefore, because he told them his ID could be found in a jacket pocket and because he asked for a jacket, officers reasonably could conclude that they were permitted to look in jacket pockets. *Id*. at 668 (explaining that officers could look inside a container that could conceivably contain drugs because the suspect had consented to a search based on suspected narcotic possession and "[t]he scope of a consent search may also be limited, if not by the suspect, by the stated object of the search.").

readily visible in plain view during the protective sweep. Therefore, this Court finds that the protective sweep was justified and falls within the constraints given by the Fifth Circuit.

**C. The firearms were found in plain view.**

Cadet also contests that the firearms were found in plain view during the protective sweep. He argues that because there is no body-worn camera of when they were found, the Government cannot meet its' burden.

"[E]vidence or contraband seen in plain view during a lawful sweep can be seized and used in evidence at trial." *United States v. Garcia-Lopez*, 809 F.3d 834, 839 (5th Cir. 2016) (citing *United States v. Jackson*, 596 F.3d 236, 242 (5th Cir. 2010)). "While the Fourth Amendment generally prohibits seizures, the 'plain view' exception allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was 'immediately apparent;' and (4) the police had a lawful right of access to the item." *United States v. De Jesus-Batres*, 410 F.3d 154, 159 (5th Cir. 2005).

Since this Court has found that the officers' protective sweep was justified, the second and fourth factors are the two that remain at issue. According to the officers' testimony, when conducting the protective sweep, they entered the downstairs bedroom and saw two firearms in plain view. Defense counsel argued that right before they entered the downstairs bedrooms, the officers' body-worn camera was covered or blocked, so we are unable to actually see if the firearms were in plain view. While it is unfortunate that the body-worn camera was covered and there is no footage of the discovery of the firearms,

the officer testimony provides uncontroverted evidence that the firearms were in plain view during the protective sweep. Thus, based on the testimony presented, this Court finds that the firearms were in plain view during an authorized protective sweep and were seized in accordance with the Fourth Amendment.

## IV. CONCLUSION

For the reasons stated above, the Court finds that the officers had did not violate Cadet's rights during his detention nor during the protective sweep of the townhome. Accordingly, the Motion to Suppress Evidence (Dkt. 70) is **DENIED**.

SIGNED at Houston, Texas on October 21, 2026.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE